| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br><br>Broege, Neumann, Fischer & Shaver, LLC<br>*Attorneys for Sabir, Inc.*<br>25 Abe Voorhees Drive<br>Manasquan, NJ 08736<br>Telephone: (732) 223-8484<br>Facsimile: (732) 223-2416<br>Timothy P. Neumann, Esq.<br>(tneumann@bnfsbankruptcy.com) | |
| In Re<br><br>G&Y REALTY, LLC,<br><br>      Debtor. | CHAPTER 11<br><br>CASE NO.: 14-16010-RG<br><br>Judge: Hon. Rosemary Gambardella<br><br>Hearing Date: 4/14/2014 |

## CERTIFICATION OF BARIS ALKOC IN OPPOSITION TO MOTION OF ASSIGNEE FOR BENEFIT OF CREDITORS TO DISMISS CASE

    Baris Alkoc, of full age, hereby certifies, as follows.

1. I am the president of Sabir, Inc. ("Sabir").

2. The alleged debtor, G&Y Realty, LLC ("G&Y" or "Alleged Debtor"), operated approximately twenty-six gas stations in locations which it leased from unaffiliated third party landlords.

3. Sabir was the major supplier of gasoline and related products to G & Y,

4. Sabir is owed approximately $4,100,000 and is by far the largest creditor of G&Y and the largest victim of crimes perpetrated by the principals of the Debtor.

5. Sabir is a victim of a massive fraud perpetrated by the principals of the Alleged Debtor.

___

6. The management of the alleged Debtor was comprised of two individuals, Guy Madmon and Yuval Amiel ("Madmon & Amiel").

7. Both have been arrested and are out on bail. According to Northjersey.com:

**Second of alleged gas station check kiters released**

March 5, 2014    Last updated: Wednesday, March 5, 2014, 8:02 AM
BY HUGH R. MORLEY
STAFF WRITER
The Record

Dueling attorneys sparred in a Passaic County bail hearing Tuesday over whether two North Jersey gas station owners wrote bad checks totaling nearly $2 million for gasoline supplies in a calculated crime spree or just a business deal gone wrong.

Eventually, Superior Court Judge Raymond A. Reddin, sitting in Paterson, allowed defendant Guy Madmon of Clifton to post a bond as part of his $200,000 bail, instead of all cash as required in an earlier bail hearing. Madmon was released on bail later in the day, when his mother posted a property in Fair Lawn as collateral to the bail bond.

Madmon, 36, and his business partner, Yuval Amiel, 34, of Englewood are accused of writing five checks for $398,552 each through their company, G&Y Realty, to a Long Branch gas distribution company even though G&Y Realty's bank account had insufficient funds to cover the checks.

Clifton Police arrested Madmon at Newark Liberty International Airport on Feb. 24, after he returned from Israel, where he had flown earlier in the month. Amiel, arrested on Feb. 6, was released from Passaic County Jail on Feb. 14. Bail was set for the two men at $200,000 each.

Assistant Prosecutor Jay McCann described the pair's action as a "pump and run" scheme in which Madmon and Amiel for two weeks ran up gasoline supplies for their gas stations and sold it at a low price for cash. They then paid the distributor with checks to be drawn on a Bank of America account that had already been frozen, because the pair were "check kiting," or writing checks on accounts that lacked sufficient funds, McCann said.

___

"I suspect what happened here goes way beyond bad checks, and we are just starting the investigation," said the assistant prosecutor, who urged the judge not to lower Madmon's bail.

McCann said he believes that there may be another "potential victim," Daibes Oil of Edgewater, which may also be owed about $2 million.

Daibes Oil, and its owner, Munir Daibes, filed suit in Bergen County against Madmon, Amiel and G&Y Realty on Jan. 24, claiming they failed to pay $2.3 million owed for gas supplied in December and January to stations they owned.

Reddin, however, said he could only take into account the charges "on the table right now."

"I can't set a bail on charges that may be filed," he said.

Madmon's attorney, John Whipple of Morristown, argued in court that the case "arises out of a commercial business dispute."

He said there were extensive interactions over two months between Madmon and Amiel and the alleged victim, Baris Alkoc, his company, Sabir Inc. of Long Branch, and its attorney. As part of the talks, the pair sought to resolve their debt by giving the victim a "large amount of funds" and the use of nine of their more than two-dozen gas stations to operate and "reap all the profits and income" from, Whipple said.

He said Madmon, an Israeli citizen who has lived in Clifton since 2007, presented no flight risk, as demonstrated by the fact that he voluntarily came back from Israel when he heard about the charges.

McCann, however, urged the court to take into account Madmon's criminal history, which includes a 2004 guilty plea for involvement in the distribution of the drug Ecstasy, for which he served 70 months in prison. He also was charged in a 2009 sweep by the Essex County Prosecutor's Office in which six people were accused of a loan-sharking and credit-card operation. In that scheme, victims were allegedly defrauded of more than $1 million, but the charge against Madmon was later dismissed.

McCann said Madmon had earlier been convicted of possession of a stolen vehicle and of a burglary that started out as a home invasion.

___

> Whipple replied that those incidents happened in Madmon's teens, and he had now moved on with his life.

8. As a result of these crimes, Sabir is currently a creditor of G&Y and has a claim in the amount of $4,131,632.42.

9. Both Madmon and Amiel were managing the Alleged Debtor when millions of dollars from the sale of gasoline supplied by Sabir and other creditors disappeared. The $4,100,000 Sabir is owed represents fuel that was turned into cash and the cash has apparently vanished, I believe off shore.

10. The disappearance of these funds needs to be investigated and if possible recovered. The Bankruptcy Court has nationwide jurisdiction and is better equipped to pursue purloined funds across state and possibly international borders.

11. Clearly the past management of the Debtor is not to be trusted to fulfill the fiduciary obligations of a debtor-in-possession.

## **HOW THE PETROLEUM WHOLESALING BUSINESS WORKS**

12. Sabir buys product on short-term open credit from different petroleum companies, also known as refineries. The application for such credit is very extensive and many of the refineries require years of positive relationships before they extend open credit. Sabir has been working with these companies for 15+ years.

13. Once an account with a refinery is opened, the wholesaler is required to have all of its truckers/drivers approved by the refineries to pick up fuel under the wholesaler's account. Criminal background checks, insurance policies, etc. are required.

14. Once credit is extended and the truck drivers are cleared, the refinery commences selling. Sabir has 10 days from the day its drivers picked up the gas to pay the bill. The price per

___

gallon is determined by the market which can fluctuate from hour to hour, day to day and also by product…regular, premium or diesel.

15. Sabir sends out price per gallon quotes to its approved customers. All customers must fill out a credit application and sign a personal guarantee before any fuel is delivered. The price per gallon Sabir quotes, usually includes the cost of trucking. The Debtor paid for their own trucking and ultimately failed to pay 2 of their trucking companies who are also creditors of the Alleged Debtor.

16. Customers put their order in to Sabbir the night before the day of delivery. Their order consists of what kind of fuel is needed (regular, premium or diesel), how many gallons and the location of the gas station to where the delivery must be made. The maximum gallons that can be delivered via tanker truck is 9,000 gallons. This can be divided, as most tankers have 2 to 3 compartments. So you can have for example 7500 gallons of regular fuel and 1000 gallons of diesel in the same tanker.

17. Within 24 to 48 hours of delivery Sabir sends an invoice to the customer for the fuel that was delivered. The customer than has 5 days to pay the invoice. That leaves Sabir a very small window to make sure all payments it receives from its customers clear before sending payment to the refinery.

18. The location of the gas station and the retail price per gallon the station charges will determine the amount of gas a station will sell. Some stations take a delivery every day; some every other day. Only 2 of our customers take a delivery every 4 to 5 days. Madmon & Amiel had 33 gas stations to fuel so they needed to take multiple deliveries every day. The Debtor's fuel bills were revolving. It never had a zero balance. There were daily delieveries and daily payments, all in the ordinary course of business.

___

19. Sabir has been selling fuel to Madmon & Amiel since April 2012. They started off small since they were buying from multiple wholesalers, then eventually grew over time to an average of two million dollars per week in volume with Sabir alone.

## TIMELINE OF CRITICAL EVENTS

20. On December 13, 2013 Friday, Madmon & Amiel gave Sabir 5 checks drawn on 4 different banks totaling over two million dollars. Recall, this represents only one week's business. They instructed me to only deposit 4 of them and leave the 5th one for Monday, the 16th. I deposited the 4 checks as instructed.

21. On December 16th, 2013, a Monday, I attempted to deposit the 5th check and Sabir's bank refused the deposit. I was told by my bank that the 4 checks deposited Friday are no good and that the Dbetor's account was frozen

22. The same day, I telephoned Madmon & Amiel and they admitted that their accounts at the 4 different banks they were dealing with had all frozen their accounts on Wednesday December 11th, 2013. They said that they thought that by the time our checks hit their account for payment, they might have their accounts open again. I later found out, but did not know at the time, that the reason their accounts were frozen was due to the fact that they were being investigated for check kiting. They knew this all along but didn't tell me about it and continued to pick up gas from the refineries and charging Sabir's account. They have committed fraud, theft by deception, issuing bad checks, etc.

23. The same day, Monday, December 16th, 2013 at 8:00 pm I cut off all future gas deliveries to Madmon & Amiel but could not lock their truckers out of the Sabir account until the refinery opened at 9am on December 17th, 2013. They continued to lift gas throughout the night of

___

December 17th. By the time I finally stopped the bleeding, they had sstolen more than $4,100,000 worth of fuel.

24. Up until I was given the bad checks, Sabir had done business with Madmon & Amiel and was always paid on a timely basis. Since Sabir only received 10-days of credit,, they would have been cut off long ago had they not been reliable customers. The Assignee would like to sue Sabir for receving preferential transfers for payments received, but he would have to prove that G&Y intended to prefer Sabir over other creditors, and that is clearly not the case. Up until this fraud, all the payments Sabir received were made in the ordinary course of business in conformity to the credit terms established between Sabir and G&Y.

25. After that, promises ensued which culminated in the execution of the Operating Agreement on January 15th, 2014. pursuant to which G&Y transferred to Sabir the right to operate eight of G&Y's leased gas stations and retain the income generated after payment by Sabir of all expenses.  Sabir assumed responsibility for "all payments to the landlord and others as may be required under each of the leases . . . .[and] all expenses including employee wages during its operating of said facilities." A copy of the Operating Agreement is annexed hereto as Exhibit A. The eight stations are at the following locations: Bergenfield; Denville; Garfield; North Bergen; Paramus; Wayne; Westwood 315 Old Hook; Westwood 320 Old Hook.

26. The eight stations that were the subject of the Operating Agreement had been operated by Sabir but two locations, Denville and Westwood 315 have been taken back by the landlords, and Sabir is now operating 6. My understanding is that there is nothing to prevent more landlords from terminating leases under the New Jersey assignment laws but that they cannot unilaterally terminate under bankruptcy law. At least two leases have already been lost by the Assignee.

_____

27. Of the other 18 locations, eight may have been sold or transferred by G&Y to unknown parties. Sabir delivered gasoline to these locations. These locations should be investigated to determine whether they were improperly or fraudulently transferred.

28. On January 22nd, 2014 Guy Madmon told me that the money was going to be released from the banks on Monday January 27th, 2014.  I then received a text from Guy's cell phone at 4:19 pm stating Bank of America got paid and Eric Mason picked up the check. Madmon wanted to meet me on Tuesday January 28th, 2014 to meet with the landlords of the gas stations to have them sign the lease assignments into Sabir's name.

29. On January 27th , 2014, the Alleged Debtor made a Deed for Assignment to Steven Mitnick, assignee for the benefit of creditors (the "Assignee"), which is now pending in Surrogate Court in Hudson County Docket # 308205 (the "ABC Proceedings").

30. On January 27th, 2014,  9:00 pm, Guy Madmon, Yuval Amiel & Lizzette Fernandez boarded a plane from JFK to Tel Aviv Israel, I believe with the stolen money.

31. On January 28th, 2014, Yuval Amiel and Lizette Fernandez were sent back the US. In my opinion, either Yuval or Lizette did not have their paperwork in order and were not let into Israel. They landed in JFK that night and that is when the marshal's arrested Yuval and sent him to Riker's Island.

32. On February 23rd, 2014 Guy Madmon flew back to the US and was arrested at the airport once he landed.

33. In the ABC Proceedings, the Assignee filed a complaint against Sabir to avoid the Operating Agreement as a preference under the law of New Jersey governing assignments for the benefit of creditors.

_____

34. On March 20, 2014 the Surrogates Court ruled from the bench that the Operating Agreement was a preference and was voided. No order has been entered memorializing that ruling. I intended to appeal the ruling because I was advised that the law governing the avoidance of preferences in ABC proceedings requires proof that there was an actual intention to prefer one creditor over others, and I felt that no such intention had been proved or existed.

### CHAPTER 11 BENEFITS CREDITORS

35. I understand that the Bankruptcy Code provisions for the avoidance of preferences does not require proof of intent and that Sabir will have no defense to avoidance of the Operating Agreement in this bankruptcy case. I nevertheless filed the involuntary petition in this case because I believe creditors will benefit. I will help to minimize administrative expenses by working with the trustee, once he or she is appointed, to effect an orderly transfer to the trustee of the 6 remaining stations which are subject to the Operating Agreement. In the interim, it is crucial that the stations remain open. A closed gas station faces risks in terms of the lapse of legally required insurance, environmental maintenance, tank registration and periodic testing requirements.

36. The Asignee alleges that I was trying to avoid exposute to preference claims he would bring against Sabir, but that is nonsense. Sabir never received any money after the bad checks and all payments made prior thereto were in the ordinary course of business; not with any intention to prefer Sabir over other creditors.

37. I believe that all creditors will fare better in bankruptcy than they would in the ABC Proceeding. I understand that the commissions of an assignee are capped at 20% but the cap on trustee's comissions is much less under the Bankruptcy Code.

_____

38. I also believe that the most valuable assets of the estate are the leases and I understand that the Bankruptcy Code prevents unilateral termination of the leases and time to cure payment defaults but that there is no provisoin in the ABC Proceedings to stay lease termination and permit a cure of such defaults. Assumption and sale over the objection of landlords whose leases are not assignable without landlord consent can also be achieved under the Bankruptcy Code as I understand it and such is apparently not the case in the ABC Proceedings. Under the Bankruptcy Code as I understand it, there will be a period of 120 days to appraise and properly market the leases, during which time the landlords will not be permitted to terminate the leases without court approval.

39. The Assignee hired an auctioneer and was in the process of selling the alleged Debtor's leases. At the March 20 hearing in the ABC Proceedings, Sabir and other major creditors, objected that the sale process was moving too quickly and opposed the efforts of the Assignee to sell the leases.

40. I do not intend to contest the avoidance of the Operating Agreement but wish to file a Chapter 11 plan. I envision a plan in which the $4,100,000 claim of Sabir would be subordinated to the claims of other creditors and Sabir pay to the other creditors far more than they would receive in any liquidation under Chapter 7 or in the ABC Proceedings. In return, Sabir would purchase some of the leases at least the 6 that Sabir is now operating. If the Plan is confirmed, Sabir will subordinate its claim, by far the largest, to the claims of other creditors, and creditors will receive far more than they could ever hope to receive under the ABC Proceeding or Chapter 7. In the ABC Proceedings, there would be no plan, just a liquidation, and Sabir would not subordinate its claim. I believe that the Sabir claim of more than $4.100,000 represents more than half of all claims and the benefit to creditors from a

___

subordination of the Sabir claim will be substantial. In addition, I understand that creditors will be able to vote in favor or against the plan. There is no creditor voting in the ABC Proceedings. Creditors should at least have the opportunity to choose between a straight liquidation in which Sabir holds the largest claim and a plan which eliminates the Sabir claim of $4,100,000 from the distribution. The Assignee is running rough shod over the wishes of creditors in the ABC Proceedings.

41. I believe the population of unsecured creditors is approximately $7,000,000 including the Sabir claim of $4,100,000. I do not believe there are any priority tax claims. If that is accurate, and Sabir subordinates its claim there will be approximately $3,000,000 of unsecured claims to be dealt with. There may be landlord breach claims as well. Sabir will propose a plan that will provide for an initial deistribution to unsecured creditors of $300,000 which I assume will yield a distribution on confirmation of 10%. Any other lease that has not been terminated prepetition can be marketed and sold and those funds as well can augment the distribution. Finally, Sabir will pay $120,000 per year at the rate of $10,000 per month for 8 years or $960,000, so that, assuming my assumptions regarding the absence of priority claims is accurate, the total payment to unsecured creditors will be not less than $1,260,000. In order to expedite the filing of a plan, I believe a trustee should be appointed.

42. In liquidation, the Sabir claim will amount to approximately 57% of the general unsecured claims. If the Assignee sold all the leases for $1,300,000 as he claims in his certification, his commsions would be 20% plus his professional expenses, and the remaing pot might be $900,000. Of that, Sabir would be entitled to slightly more than $500,000, leaving say $400,000 for unsecured creditors. Under the plan I will propose, creditors will receive three times that amount or more.

_____

43. The Debtor has no ongoing operations. There are at least 18 leases other gas stations that are executory contracts Debtor is incapable of operating. There may have also been 8 additional leases that were either sold or transferred. Perhaps some of these were in the individual names of Madmon and Amiel. I do not know. A trustee should investigate this.

44. Accordingly, a trustee should be appointed to oversee the disposition of the leases and pursue the recovery of missing funds and to end exclusivity so that Sabir can file its plan.

I certify that the above statements made by me are true. I acknowledge that if any of the above statements are willfully false, I am subject to punishment.

Date: April 10, 2014

/s/     *Baris Alkoc*
BARIS ALKOC