| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br><br>Broege, Neumann, Fischer & Shaver, LLC<br>*Attorneys for Sabir, Inc.*<br>25 Abe Voorhees Drive<br>Manasquan, NJ 08736<br>Telephone: (732) 223-8484<br>Facsimile: (732) 223-2416<br>Timothy P. Neumann, Esq.<br>(tneumann@bnfsbankruptcy.com) | |
| In Re<br><br>G&Y REALTY, LLC,<br><br>    Debtor. | CHAPTER 11<br><br>CASE NO.: 14-16010-RG<br><br>Judge: Hon. Rosemary Gambardella<br><br>Hearing Date: 4/14/2014 |

**MEMORANDUM OF LAW IN OPPOSITION TO ASSIGNEE'S MOTION TO DISMISS INVOLUNTARY BANKRUPTCY PETITION**

**STATEMENT OF FACTS**

    The alleged debtor, G&Y Realty, LLC ("G&Y" or "Alleged Debtor"), operated approximately twenty-six gas stations in locations which it leased from unaffiliated third party landlords. Sabir, Inc. ("Sabir") was the major supplier of gasoline and related products to G & Y. Baris Alkoc ("Baris") is the president of Sabir. Sabir is owed approximately $4,100,000 and is by far the largest creditor of G&Y and the largest victim of crimes perpetrated by the principals of the Debtor.

    Sabir among others is a victim of a massive fraud perpetrated by the principals of the Alleged Debtor. The management of the alleged Debtor was comprised of two individuals, Guy Madmon and Yuval Amiel ("Madmon & Amiel"). Both have been arrested and are out on bail. As a result of these crimes, Sabir is currently a creditor of

G&Y and has a claim in the amount of $4,131,632.42. Both Madmon and Amiel were managing the Alleged Debtor when millions of dollars from the sale of gasoline supplied by Sabir and other creditors disappeared. The $4,100,000 Sabir is owed represents fuel that was turned into cash and the cash has apparently vanished, possibly off shore. The disappearance of these funds must be investigated and if possible recovered. The Bankruptcy Court has nationwide jurisdiction and is better equipped to pursue purloined funds across state and possibly international borders.

Sabir buys product on short-term open credit from different petroleum refineries. The application for such credit is very extensive and many of the refineries require years of positive relationships before they extend open credit. Sabir has been working with these companies for 15+ years. Once an account with a refinery is opened, the wholesaler is required to have all of its truckers/drivers approved by the refineries to pick up fuel under the wholesaler's account. Criminal background checks, insurance policies, etc. are required. Once credit is extended and the truck drivers are cleared, the refinery commences selling. Sabir has 10 days from the day its drivers pick up the gas to pay the bill. The price per gallon is determined by the market which can fluctuate from hour to hour, day to day and also by product…regular, premium or diesel. Sabir sends out price per gallon quotes to its approved customers. All customers must fill out a credit application and sign a personal guarantee before any fuel is delivered.

Customers place orders with Sabir the night before the day of delivery. Their order consists of the type of fuel needed (regular, premium or diesel), number of gallons and location of the gas station(s) to where the delivery must be made. The maximum gallons that can be delivered by a single tanker truck is 9,000 gallons.

Within 24 to 48 hours of delivery Sabir sends an invoice to the customer for the fuel that was delivered. The customer then has five days to pay the invoice. That leaves Sabir a very small window to make sure all payments it receives from its customers clear before sending payment to the refinery. The location of the gas station and the retail price per gallon the station charges will determine the amount of gas a station will sell. Some stations take a delivery every day; some every other day. Madmon & Amiel had thirty-three gas stations to fuel so they needed to take multiple deliveries every day. The Alleged Debtor's fuel bills were revolving. It never had a zero balance. There were daily deliveries and daily payments, all in the ordinary course of business. Sabir has been selling fuel to Madmon & Amiel since April 2012 and by December of 2013, Sabir was selling an average of two million dollars per week to Madmon & Amiel the alleged Debtor.

On December 13, 2013 Friday, Madmon & Amiel gave Sabir five checks drawn on four different banks totaling over two million dollars. This represented only one week's business. Madmon & Amiel instructed Baris to deposit only four of the checks immediately and deposit the fifth check on Monday, the 16th. Sabir deposited the four checks as instructed. On December 16th, 2013, a Monday, Sabir attempted to deposit the fifth check and Sabir's bank refused the deposit. Baris was told by Sabir's bank that the 4 checks deposited Friday were no good and that the Debtor's account was frozen. The same day, Baris telephoned Madmon & Amiel and they admitted that their accounts at the four different banks they were dealing with had all frozen their accounts on Wednesday, December 11th, 2013. They said that they thought that by the time the checks hit their account for payment, they might have their accounts open again. Sabir later

3

found out, but did not know at the time, that the reason their accounts were frozen was due to the fact that they were being investigated for check kiting. They knew this all along but didn't tell Sabir about it and continued to pick up gas from the refineries and charging Sabir's account.

The same day, Monday, December 16th, 2013 at 8:00 pm Sabir cut off all future gas deliveries to Madmon & Amiel but could not lock their truckers out of the Sabir account until the refinery opened at 9am on December 17th, 2013. Madmon & Amiel continued to obtain gas throughout the night of December 17th. By the time Baris finally stopped the bleeding, they had stolen more than $4,100,000 worth of fuel. Up until Baris was given the bad checks, Sabir had done business with Madmon & Amiel and was always paid on a timely basis. Because Sabir only received 10-days of credit, they would have been cut off long ago had they not been reliable customers.

Thereafter promises ensued which culminated in the execution of the Operating Agreement on January 15th, 2014 pursuant to which G&Y transferred to Sabir the right to operate eight of G&Y's leased gas stations and retain the income generated after payment by Sabir of all expenses. Sabir assumed responsibility for "all payments to the landlord and others as may be required under each of the leases . . . .[and] all expenses including employee wages during its operating of said facilities." The eight stations are at the following locations: Bergenfield; Denville; Garfield; North Bergen; Paramus; Wayne; Westwood 315 Old Hook; Westwood 320 Old Hook. The eight stations that were the subject of the Operating Agreement had been operated by Sabir but two locations, Denville and Westwood 315 have been taken back by the landlords, and Sabir is now operating 6. There is nothing to prevent more landlords from terminating leases under the

4

New Jersey statutes governing assignments for the benefit of creditors - but they cannot unilaterally terminate under bankruptcy law. Two leases have already been lost by the Assignee.

Of the other 18 locations, eight may have been sold or transferred by G&Y to unknown parties. Sabir delivered gasoline to these locations. These locations should be investigated to determine whether they were improperly or fraudulently transferred.

On January 22nd, 2014 Guy Madmon told Baris that money was going to be released from the banks on Monday January 27th, 2014. Baris then received a text from Madmon's cell phone at 4:19 pm stating Bank of America got paid and Eric Mason picked up the check. Madmon wanted to meet Baris on Tuesday January 28th, 2014 to meet with the Landlords of the gas stations to have them sign the lease assignments into Sabir, Inc's name.

On January 27th, 2014, Madmon & Amiel signed the deed of assignment for the benefit of creditors of the Debtor which is now pending in Surrogate Court in Hudson County Docket # 308205 (the "ABC Proceedings"). The same day at 9:00 pm, Guy Madmon, Yuval Amiel & Lizzette Fernandez boarded a plane from JFK to Tel Aviv Israel, possibly with the stolen money.

On January 28th, 2014, Yuval Amiel and Lizette Fernandez werre sent back the US. In Baris's opinion, either Yuval or Lizette did not have their paperwork in order and were not let into the country. They landed in JFK that night and that is when the marshal's arrested Yuval and sent him to Riker's Island. February 23rd, 2014 Guy Madmon flew back to the US and was arrested at the airport immediately.

5

In the ABC Proceedings, the Assignee filed a complaint against Sabir to avoid the Operating Agreement as a preference under the law of New Jersey governing assignments for the benefit of creditors.

On March 20, 2014 the Surrogates Court ruled from the bench that the Operating Agreement was a preference and was voided. No order has been entered memorializing that ruling. Sabir intended to appeal the ruling because the law governing the avoidance of preferences in ABC proceedings requires proof that there was an actual intention to prefer one creditor over others, and no such intention had been proved or existed. Section 547 of the Bankruptcy Code does not require proof of intent and that Sabir will have no defense to avoidance of the Operating Agreement in this bankruptcy case. It nevertheless filed the involuntary petition in this case because creditors will benefit. Baris has also certified that he will help to minimize administrative expenses by working with the trustee, once he or she is appointed, to effect an orderly transfer to the trustee of the six remaining stations which are subject to the Operating Agreement. In the interim, it is crucial that the stations remain open. A closed gas station faces risks in terms of the lapse of legally required insurance, environmental maintenance, tank registration and periodic testing requirements.

The Assignee alleges that Baris was trying to avoid exposure to preference claims he would bring against Sabir, but that is nonsense. Sabir never received any money after the bad checks and all payments made prior thereto were in the ordinary course of business; not with any intention to prefer Sabir over other creditors.

All creditors will fare better in bankruptcy than they would in the ABC Proceeding. The commissions of an assignee are capped at 20% under applicable state law but the cap

6

on trustee's commissions is much less under the Bankruptcy Code. The most valuable assets of the estate are the leases and the Bankruptcy Code prevents unilateral termination of the leases and time to cure payment defaults. There is no comparable provision in the ABC Proceedings to stay lease termination and permit a cure of defaults. The assumption and sale over the objection of landlords whose leases are not assignable without landlord consent can also be achieved under the Bankruptcy Code. Such is not the case in the ABC Proceedings. Under the Bankruptcy Code there will be a period of 120 days to appraise and properly market the leases, during which time the landlords will not be permitted to terminate the leases without court approval.

The Assignee hired an auctioneer and was in the process of selling the alleged Debtor's leases. At the March 20 hearing in the ABC Proceedings, Sabir and other major creditors, objected that the sale process was moving too quickly and opposed the efforts of the Assignee to sell the leases.

Sabir does not intend to contest the avoidance of the Operating Agreement but wishes to file a Chapter 11 plan. It envisions a plan in which the $4,100,000 claim of Sabir would be subordinated to the claims of other creditors and Sabir pay to the other creditors far more than they would receive in any liquidation under Chapter 7 or in the ABC Proceedings. In return, Sabir would purchase some of the leases. If the Plan is confirmed, Sabir will subordinate its claim, by far the largest, to the claims of other creditors. In the ABC Proceedings, there would be no plan, just a liquidation, and Sabir would not subordinate its claim. The Sabir claim of more than $4.100,000 represents more than half of all claims and the benefit to creditors from a subordination of the Sabir claim will be substantial. In addition, creditors will be able to vote in favor or against the

7

plan. There is no creditor voting in the ABC Proceedings. Creditors should at least have the opportunity to choose between a straight liquidation in which Sabir holds the largest claim and a plan which eliminates the Sabir claim of $4,100,000 from the distribution. The Assignee is running rough shod over the wishes of creditors in the ABC Proceedings.

Baris believes the population of unsecured creditors is approximately $7,000,000 including the Sabir claim of $4,100,000. He does not believe there are any priority tax claims. If that is accurate, and Sabir subordinates its claim there will be approximately $3,000,000 of unsecured claims to be dealt with. There may be landlord breach claims as well. Sabir will propose a plan that will provide for an initial distribution to unsecured creditors of $300,000 which Baris believes will yield a distribution on confirmation of 10%. Any other lease that has not been terminated prepetition can be marketed and sold and those funds as well can augment the distribution. Finally, Sabir will pay $120,000 per year at the rate of $10,000 per month for 8 years or $960,000, so that, assuming assumptions by Baris regarding the absence of priority claims is accurate, the total payment to unsecured creditors will be not less than $1,260,000. In order to expedite the filing of a plan, Baris believes a trustee should be appointed.

In liquidation, the Sabir claim will amount to approximately 57% of the general unsecured claims. If the Assignee sold all the leases for $1,300,000 as he claims in his certification, his commissions would be 20% plus his professional expenses, and the remaining pot might be $900,000. Of that, Sabir would be entitled to slightly more than $500,000, leaving possibly $400,000 for unsecured creditors. Under the plan Baris will propose, creditors will receive three times that amount or more.

8

Accordingly, a trustee should be appointed to oversee the disposition of the leases and pursue the recovery of missing funds and to end exclusivity so that Sabir can file its plan.

## LEGAL ARGUMENT

### I. THE INTERESTS OF CREDITORS WOULD BE BETTER SERVED IN A BANKRUPTCY THAN IN THE ABC PROCEEDING

The Assignee contends that the creditors would be better served in the ABC Proceeding and that Sabir seeks only to avoid Judge Santiago's holding in the ABC proceedings. Sabir has stated that it will not challenge the avoidance of the Operating Agreement and will concede that the leases are property of the estate. More importantly, Sabir will subordinate its claim that of all other creditors. Given that Sabir's claim of $4,100,000 represents more than half of the total claims of all creditors the benefit to other creditors will be substantial.

The Assignee would like to sue Sabir for receiving preferential transfers for payments received, but he would have to prove that G&Y intended to prefer Sabir over other creditors, and that is clearly not the case. See, Rosner v Plaza Hotel Assoc., Inc., 146 NJ Super 447, 456 (App. Div.1977) ("The assignee's insurmountable problem, however, as we see it, is the voidability test prescribed by the Assignment Act, namely, the intent of the debtor to create a preference.") Up until this fraud, all the payments Sabir received were made in the ordinary course of business in conformity to the credit terms established between Sabir and G&Y.

The Assignee opines that delay in selling the stations will chill potential buyers. Whether or not that will happen is pure speculation. It is just as likely that additional time to properly market the leases might attract higher prices. Other creditors besides

Sabir objected that the sale process is moving too quickly. See Transcript of March 20, 2014 Surrogate's Court, Docket No. 308205. Christine Smith represents SOS, a creditor owed approximately $800,000.

> MS. SMITH: Your Honor, can I please be heard with regard to a non-landlord creditor? We submitted to Your Honor an objection . . . the speed that this process has gone through, we do not feel as a creditor it may not have gotten the highest and best price, you know finding step one of these leases can be sold.
> Step two is that everyone seems to have brushed over the process. We do not feel it was properly advertised, et cetera to get the best prices.
> And that's what our client would be satisfied from. So we understand the need for speed, but we also understand that this may be the only assets and they really need advertised and fully auctioned, et cetera."

Tr. at p. 72, lines 1-20.

In addition, the Bankruptcy Code safeguards the leases from unilateral termination by the landlords by permitting a 120-day cure period. Two leases have already been terminated and others may be lost if the petition is dismissed.

The Assignee relies on In re Elsub Corp., 66 B.R. 189 (Bankr. D. NJ 1986), where it was alleged that a single creditor filed an involuntary Chapter 11 petition in bad faith because there were more than eleven creditors and the alleged detor was paying its debts when due. The Court denied the creditor's summary judgment motion, holding that good faith depended on the totally of the circumstances, and there were fact issues precluding summary judgment. In the instant case, there are three petitioning creditors and no one can deny that the predicate for filing – the appointment of a custodian within 120 days of the petition – has in fact occurred. Other cases relied upon by the Assignee involved alleged debtors who had demonstrated that the petitioning creditor(s) had alleged in bad faith that the debtor had less than 12 creditors, or that the debtor was not paying its debts when due. In the instant case, the petition was filed by three creditors, the alleged debtor

10

is out of business and clearly not paying any of its debts, and a custodian was appointed within the 120-day prepetition period.

The insant case is similar to In re Nader Homes, Inc., 11-22760 DHS, 2011 WL 2267735 [Bankr DNJ June 6, 2011]and what the Court stated there is apposite:

> In contrast, the present case presents no evidence of bad faith. The petitioning creditors complied with the requirements of section 303(b). Each holds a state court judgment against NHI. Together, they represent sixty-three percent (63%) of non-insider claims. The remaining large creditors are law firms and would not be expected to join in the petition. Thus, it is clear that the creditors holding a majority of the claims favor this forum.
>
> Although NHI attempts to portray the filing as a mere litigation tactic by Sukola and Gorse, all Petitioning Creditors have stated their belief that chapter 7, for several reasons outlined above, represents their best chance at recovery. Whether they will in fact realize a more substantial recovery through the bankruptcy process than through the state court proceeding cannot be determined at this time. However, the Court has no reason to doubt the sincerity of their efforts. Accordingly, the totality of the circumstances does not demonstrate that the petition was filed in bad faith.

Sabir, is by far the largest creditor representing probably close to 60% of the creditor body and has committed to filing a plan which, if confirmed, will subordinate its claim to the claims of other creditors and pay those creditors far more than they would receive in a Chapter 7 or in the ABC proceedings. By agreeing to subordinate its claims to the interests of all other creditors Sabir cannot be accused of advancing its own interests to the detriment of other creditors.

The Assignee has invoked section 707 of the Code in its brief. By its own terms, that section applies only in Chapter 7, not Chapter 11. As the Court is well aware § 707 refers to Chapter 7 of the Bankruptcy Code and warrants dismissal or conversion of a bankruptcy for abuse of its provisions. Sabir filed a Chapter 11 petition, so Chapter 7 and all argument stemming from Chapter 7 is irrelevant.

11

## II. THE ASSIGNEE LACKS STANDING TO CONTEST THE BANKRUPTCY PROCEEDING

An assignee is neither the alleged debtor nor general partner in a partnership debtor and may not challenge the petition. 11 USCA § 303(d) states that "[t]he debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to a petition under this section." Indeed, nowhere in § 303 does it state that anyone but the debtor (or general partner in a partnership debtor) may contest the petition. This limitation is mirrored in Federal Rule of Bankruptcy Procedure 1011(a) which states:

> The debtor named in an involuntary petition, or a party in interest to a petition for recognition of a foreign proceeding, may contest the petition. In the case of a petition against a partnership under Rule 1004, a nonpetitioning general partner, or a person who is alleged to be a general partner but denies the allegation, may contest the petition.

Again, the Assignee is not the debtor. His role in a bankruptcy case is expressly contemplated by the Bankruptcy Code. Section 101(11)(B) of the Code defines "custodian" as, *inter alia,* an "assignee under a general assignment for the benefit of the debtor's creditors." The Assignee is a custodian. The rights and duties of a custodian are set forth in Section 543 of the Code. The Fifth Circuit Court of Appeals in the case of <u>In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.</u>, 592 F3d 664, 671-72 [5th Cir 2009] characterized the efforts of a custodian to oppose an involuntary petition as bordering "on the absurd."

> [The custodian] focused his efforts on opposing the bankruptcy. Indeed, all of his attorneys' fees, which comprise more than half of the amount in controversy, stem from opposing the bankruptcy. However, **nowhere in the relevant bankruptcy statutes does it state that a superseded custodian is authorized to oppose a bankruptcy petition** or to employ the estate's resources in doing so. Indeed, as mentioned above, the statute governing a superseded custodian's post-petition duties states explicitly

that unless the custodian is expressly authorized by the bankruptcy court to continue in the administration of the estate, the custodian is restricted to delivering all property to the trustee and filing an accounting of all property that came into the custodian's possession. . . . For [the custodian] to claim that he is entitled to compensation for the **ultra vires "service" of opposing the bankruptcy** when he failed to first complete his statutorily-mandated service of winding up the estate borders on the absurd. *(emphasis supplied)*

See also, In re 245 Assoc., LLC, 188 BR 743, 747-48 (Bankr SDNY 1995) ("Once the receiver becomes aware of the filing of the petition, including an involuntary petition, he cannot make any further disbursements **or take any action** except to do what is necessary to preserve the property…"); In re Lizeric Realty Corp., 188 BR 499, 506 (Bankr SDNY 1995)("Under § 543 of the Code, a custodian who has knowledge of the commencement of a case under the Code is barred from taking any further action in the administration of the debtor's property…")

The Assignee lacks authority to challenge the petition. The Code in section 303 envisions only the Debtor having that right. The Code in section 543 circumscribes the powers of a custodian once a case is commenced. The Assignee asks the Court to ignore these provisions of its Code and exercise some equitable power. The Supreme Court has repeatedly inveighed against such judicial re-writing of the Code. Most recently, *see Law v. Siegel*, 571 U.S. __, slip op. at 6 (2014) ("We have long held that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the bankruptcy code.") (citations omitted) (internal quotation marks omitted)).

At most, the Assignee can request pursuant to section 543 to remain in possession if it is in the best interest of creditors. Procedurally, the Assignee should have moved under 543 to remain in possession. Given the commitment of Sabir to file a plan which will pay

13

creditors far in excess of what they can hope to receive in liquidation, it is clearly in the best interest of creditors to allow this case to proceed.

                                        Broege, Neumann, Fischer & Shaver, LLC
                                        Attorneys for Petitioning Creditor Sabir, Inc.

                                        By:     /s/Timothy P. Neumann_____

Dated: April 10, 2014                           TIMOTHY P. NEUMANN

15